**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| GARY T. RAMADEI, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:21-CV-01435 (JCH) |
| | : | |
| v. | : | |
| | : | |
| RADIALL USA, INC. | : | SEPTEMBER 16, 2024 |
| Defendant. | : | |
| | : | |

**RULING ON MOTION FOR AWARD OF LIQUIDATED DAMAGES (DOC. NO. 102),
MOTION FOR AWARD OF PRE- AND POST-JUDGMENT INTEREST (DOC. NO.
103), MOTION FOR FRONT PAY OR REINSTATEMENT (DOC. NO. 104), AND
MOTION FOR ATTORNEY FEES AND COSTS (DOC. NO. 105)**

## I.   INTRODUCTION

Plaintiff Gary Ramadei ("Mr. Ramadei") moves this court for awards of liquidated

damages, front pay or reinstatement, pre- and post-judgment interest, and attorneys'

fees and costs.  See Motion for Award of Liquidated Damages ("Liq. Damages Mot.")

(Doc. No. 102); Motion for Award of Pre- and Post-Judgment Interest ("Interest Mot.")

(Doc. No. 103); Motion for Front Pay or Reinstatement ("Front Pay Mot.") (Doc. No.

104); Motion for Attorney Fees and Costs ("Fees & Costs Mot.") (Doc. No. 105); see

also Reply Memorandum in Support of Motion for Award of Liquidated Damages ("Liq.

Damages Reply") (Doc. No. 110); Reply Memorandum in Support of Motion for Attorney

Fees and Costs ("Fees & Costs Reply") (Doc. No. 111); Reply Memorandum in Support

of Motion for Front Pay or Reinstatement ("Front Pay Reply") (Doc. No. 112).  The

defendant, Radiall USA, Inc. ("Radiall"), opposes all Motions but the Motion for Award of

Pre- and Post-Judgment Interest;  See Memorandum in Opposition to Motion for Award

of Liquidated Damages ("Liq. Damages Opp'n") (Doc. No. 107); Memorandum in

Opposition to Motion for Attorney Fees and Costs ("Fees & Costs Opp'n") (Doc. No.

108); Memorandum in Opposition to Motion for Front Pay or Reinstatement) ("Front Pay Opp'n") (Doc. No. 109).

For the reasons set forth below, the court grants in part the Motion for Award of Pre- and Post-Judgment, Motion for Liquidated Damages, Motion for Front Pay or Reimbursement, and Motion for Attorney Fees and Costs.

## II.   BACKGROUND

The court assumes familiarity with the facts and the procedural history pertaining to this action, most of which is provided in further detail in the court's Ruling on Motion for Summary Judgment ("MSJ Ruling") (Doc. No. 44).  The court provides a summary of the background relevant to the instant Motions.

Mr. Ramadei brought this action against his former employer, Radiall, alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(b)(1), as well as retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615.  See Complaint ("Compl.") (Doc. No. 1).

On September 8, 2023, the court granted summary judgment in Radiall's favor as to the age discrimination claims and denied summary judgment with respect to the FMLA claim.  See MSJ Ruling.  On December 8, 2023, at the conclusion of a four-day trial, the jury found that Radiall had violated the FMLA.  See Jury Verdict (Doc. No. 86) at 1.  As to damages, the jury granted a total award of $187,714.00, as compensation for, inter alia, lost wages, salary, and employment benefits.  See id. at 1.  The jury did not find that Mr. Ramadei had failed to mitigate his damages.  See id. at 2.  On an

2

advisory basis, the jury found that Radiall had acted in good faith and had reasonable grounds to believe terminating Mr. Ramadei was not a violation of the FMLA.  See id.

III.   **DISCUSSION**

   A.   Motion for Award of Pre- and Post-Judgment Interest

       1.   Pre-judgment Interest

The FMLA provides that an employer shall be liable for interest on the back pay award at "the prevailing rate".  See 29 U.S.C. § 2617(a)(1)(A)(ii).  Pre-judgment interest awards are mandatory and "automatically becom[e] part of the damages award under the plain terms of the statute."  Dotson v. Pfizer, Inc., 558 F.3d 284, 302 (4th Cir. 2009) (citing 29 U.S.C. § 2617(a)(1)(A)(i)–(iii)).  In light of the mandatory grant of pre-judgment interest and the lack of opposition from the defendant, plaintiff's Motion is granted insofar as it seeks pre-judgment interest.

The court next turns to the issue of the amount to be awarded.  Mr. Ramadei seeks pre-judgment interest in the amount of $26,186.13.  See Interest Mot. at 2–3.  Mr. Ramadei arrives at this sum by, first, multiplying the jury award of $187,714, by 4.65%—the weekly average 1-year constant maturity Treasury yield for the week of January 12, 2024—and then, tripling that amount for the approximately three years wages were withheld from November 13, 2020, the effective date of his employment termination, to December 8, 2023, the date of the jury verdict.  See id.  Mr. Ramadei uses the 4.65% rate because courts in this Circuit have looked to the federal post-judgment interest statute to calculate pre-judgment interest.  See id.  This statute provides that "interest shall be calculated . . . at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the

Federal Reserve System, for the calendar week preceding[ ] the date of the judgment." See 28 U.S.C. § 1961(a).

Although Radiall did not file a memorandum in opposition to the plaintiff's Motion for Award of Pre- and Post-Judgment Interest, it seemingly has a different understanding of the appropriate calculation according to the numbers it presented in its Memorandum in Opposition to the plaintiff's Motion for Award of Attorneys' Fees and Costs. See Fees & Costs Opp'n at 8. The defendant projected the pre-judgment interest on the back pay award to be $8,729. See id. at 8. This amount is equal to a straightforward application of the 4.65% rate to the $187,714 back pay award.

Neither the $26,196.13 amount provided by the plaintiff, nor the $8,729 amount assumed by the defendant is appropriate. The purpose of pre-judgment interest is to "discourage an employer from attempting to enjoy an interest-free loan for as long as [it can] delay paying out back wages." Chandler v. Bombardier Cap., Inc., 44 F.3d 80, 83 (2d Cir. 1994) (quoting Clarke v. Frank, 960 F.2d 1146, 1153–54 (2d Cir. 1992)). "Where prejudgment interest is given, it should be assessed upon damages only as they become due." Id. at 84. Here, the 4.65% interest rate is not the rate for the time period at issue, and both sides failed to calculate interest based on accrued earnings. See, e.g., Ferguson v. Lander Co., Inc., No. 3:06-CV-0328 (DEP), 2008 WL 921032, at *23 n. 39 (N.D.N.Y. Apr. 2, 2008). Because the methodology, and thus the amount to be awarded, is within the court's discretion, the court will determine the appropriate interest rate and calculation. See id., at *23 (citing Torres v. Costich, 935 F. Supp. 232, 236 (W.D.N.Y. Aug. 22, 1996)); Robinson v. Instructional Sys., Inc., 80 F. Supp. 2d 203,

208 (S.D.N.Y. 2000) (citing Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1071 (2d Cir. 1995)).

a.    Interest Rate

Although "[t]he Second Circuit has not definitively spoken concerning the particular methodology to be employed" in calculating pre-judgment interest under the FMLA, "it has[,] at various times, [ ] found that using either 28 U.S.C. § 1961 or 26 U.S.C. § 6621 does not present an abuse of discretion."  Ferguson, 2008 WL 921032, at *23 (citations omitted) (collecting cases); see also Brenlla v. LaSorsa Buick Pontiac Chevrolet, Inc., No. 00-CV-5207 (JCF), 2002 WL 1059117, at *12 (S.D.N.Y. May 28, 2002) (noting that courts have often applied the rate in section 1961 to pre-judgment interest awards in employment discrimination cases).  As such, and considering the lack of opposition from the defendant, the court sees no reason why it should not apply the weekly average 1-year constant maturity Treasury yield identified in section 1961 in determining pre-judgment interest.  However, while applying the weekly average Treasury yield corresponding to the week preceding judgment, see 28 U.S.C. § 1961, makes sense for post-judgment interest, it is ill suited for approximating the interest the employer collected by virtue of retaining back wages.  In that instance, the applicable average 1-year constant maturity will vary across the time between the date of termination and the date judgment is entered.

Had the plaintiff continued employment past November 13, 2020, he would have received a paycheck for the last two weeks of November in the second week of December 2020, assuming a biweekly pay schedule.  Thus, the first "missed" paycheck would have been due December 11, 2020.  The Federal Reserve determines the weekly Treasury rate each Friday by calculating the average of the daily Treasury rate,

5

published each business day of the week.  See Market Yield on U.S. Treasury
Securities at 1-Year Constant Maturity, Quoted on an Investment Basis, Federal
Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/WGS1YR (explaining that
weekly rate averages are calculated each Friday).  Therefore, the court will begin
computing pre-judgment interest from the 1-year constant maturity Treasury yield for the
week of December 18, 2020.  The average rate is 0.09% for the first year (52 weeks);
2.56% for the second year; 5.07% for the third year; and 4.91% for the period between
December 2023 to September 2024.  See id.

> b.    Calculation

The plaintiff's proposed award in the amount of $26,186.13 is also flawed
because, aside from drawing the interest rate from 2024, it is calculated by tripling the
interest on the back pay award.  See Interest Mot. at 4.  That method of calculating
assumes that the entire back pay award was due from the date of termination until the
jury's verdict.  Backpay is meant to reflect the employee's compensation, e.g., salary
plus benefits.  Thus, the best approximation for interest as it becomes due requires
applying the relevant rate to a pro rata portion of the back pay award.  Brenlla, 2002 WL
1059117, at *12 n.9 (citing Robinson, 80 F. Supp. 2d at 208).

As applied here, this means that the back pay award of $187,714 is prorated to
$62,571.33 per year for the period between December 2020 to December 2023, when
the jury reached its verdict.  The first $62,571.33 will accrue interest at an annualized
rate of 0.09% in the first year, 2.56% in the second year, 5.07% in the third year, and
4.91% in the final nine months preceding this judgment.  See, supra, Section III.A.1.a.
The second $62,571.33 is not due until the second year, so it will accrue zero interest in
the first year, thereafter, it will accrue interest at an annualized rate of 2.56% in the

second year, 5.07% in the third year, and 4.91% in the final nine months.  See id.  The third $62,571.33 will accrue interest at an annualized rate of 5.07% and 4.91%, respectively.  See id.

Considering that salary is usually paid biweekly, electing to compound pre-judgment interest annually does not realistically capture the potential interest the defendant earned by withholding wages throughout the entire year.  On the other hand, compounding interest daily fails to consider that employers only pay wages 2–3 times a month, assuming a biweekly schedule.  As such, the court's calculation compounds the interest monthly because it serves as a reasonable model.  See, e.g., Ferguson, 2008 WL 921032, at *23 n.39 (computing compounded interest by assuming the plaintiff's annual salary was fully earned halfway through the year).

Based on this methodology, Radiall earned $31.42 in 2020–2021, by withholding $5,214.28 each month at an annualized interest rate of 0.09%.  The pro rata award for 2020–2021, $62,571.33, plus the 2020–2021 interest, $31.42, together, will accrue interest at an annualized rate of 2.56%, 5.07%, and 4.91%, respectively.  In total, the first year pro rata award will accrue $7,511.76 over the period at issue.[1]  The same

---

[1]

| 2020–2021 | | | 2021–2022 | | | 2022–2023 | | | 2023–Sept. 2024 | | | Total Interest ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance ($) | Rate (%) | Interest ($) | Balance ($) | Rate (%) | Interest ($) | Balance ($) | Rate (%) | Interest ($) | Balance ($) | Rate (%) | Interest ($) | | |
| 62,571.33* | 0.09 | 31.42 | 62,602.75 | 2.56 | 1,618.98 | 64,221.74 | 5.07 | 3,333.17 | 67,554.91 | 4.91 | 2,528.18 | 7,511.76 | 70,083.09 |
| | | | 62,571.33* | 2.56 | 873.09 | 63,444.42 | 5.07 | 3,292.83 | 66,737.25 | 4.91 | 2,497.58 | 6,663.49 | 69,234.82 |
| | | | | | | 62,571.33* | 5.07 | 1,745.47 | 64,316.80 | 4.91 | 2,407.00 | 4,152.47 | 66,732.80 |
| | 31.42 | | | 2,492.07 | | | 8,371.47 | | | 7,432.76 | | 18,327.72 | 206,041.71 |

*Interest calculated based on a monthly accrual of $5,214.28.

7

methodology applied to the <u>pro rata</u> awards for the last two years yields interest amounts of $6,663.49, and $4,152.47, respectively.  In total, the accrued pre-judgment interest on damages amounts to $18,327.72.  <u>See</u>, <u>supra</u>, 1.

Accordingly, the plaintiff's Motion for Pre-Judgment Interest is granted in part. The pre-judgment interest to be awarded is $18,327.72.

2.      Post-Judgment Interest

The plaintiff seeks a post-judgment interest award to be determined at a rate of 4.65%.  <u>See</u> Interest Mot. at 1.  As discussed, <u>see</u>, <u>supra</u>, at Section III.A.1, this rate is drawn from the 1-year constant maturity Treasury yield for the week of January 12, 2024.  Section 1961 of title 28 of the U.S. Code, governing post-judgment interest awards, provides that the applicable interest rate is the average 1-year constant maturity Treasury yield . . . <u>for the calendar week preceding[ ] the date of judgment.</u>"  <u>See</u> 28 U.S.C. § 1961 (emphasis added).  Accordingly, the court grants the Motion insofar as it seeks post-judgment interest but denies the Motion as to the 4.65% rate drawn from the week of January 12, 2024.  Using the rate from the preceding week, available as of September 10, 2024, the court calculates the post-judgment interest as of today, September 16, 2024, the day the Clerk will enter judgment, to be 4.22%.

B.      <u>Motion for Award of Liquidated Damages</u>

An employer who violates the FMLA shall be liable to the employee for liquidated damages equal to the sum of the amount of the back pay award and pre-judgment interest.  <u>See</u> 29 U.S.C. § 2617(a)(1)(A)(iii).  However, if a violative employer "proves to the satisfaction of the court that the act or omission which violated section 2615 . . . was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 . . . the court may, in [its] discretion[,]"

decline to award liquidated damages.  Id.  The court's "discretion must be exercised consistently with the strong presumption under the statute in favor of doubling."  Arban v. West Pub. Corp., 345 F.3d 390, 408 (6th Cir. 2003) (quoting Elwell v. Univ. Hosps. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002)).  Thus, even if the employer acted in good faith and reasonably believed it was not violating the FMLA, the court may still award liquidated damages.  See Hite v. Vermeer Mfg. Co., 446 F.3d 858, 868 (8th Cir. 2006).  In the instant case, the jury answered "yes" when it was asked, on an advisory basis, whether Radiall had acted in good faith and reasonably believed it was not violating the FMLA when it terminated Mr. Ramadei's employment.  See Jury Verdict at 2.

The plaintiff argues that an award of liquidated damages, i.e., double damages, is merited in this case, despite the jury's advisory conclusion that Radiall acted in good faith.  See Liq. Damages Mot. at 3–7.  Mr. Ramadei emphasizes the statutory language that explicitly places the determinations of good faith and reasonableness within the court's discretion and permits the court to decline an invitation to reduce liquidated damages—even if it finds that the employer acted in good faith and had reasonable grounds to believe it was not violating the FMLA.  See id. at 3–5.  Radiall counterargues that the court should follow the jury's determination, noting that the court did not provide any indication to the jury that its answer was advisory and not binding.  See Liq. Damages Opp'n at 4–5.  Radiall points to various portions of the evidentiary record adduced at trial that, in its view, support the jury's verdict that the elimination of the Facility Manager position was made in good faith and that it reasonably believed it was not violating Mr. Ramadei's FMLA rights.  See id. at 5–11.

9

Before turning to the weight the court accords to the jury's advisory determinations, a review of the standards of reasonableness and good faith as they pertain to liquidated damages under the FMLA is warranted.   "[T]here are few cases discussing FMLA's liquidated damages provision in detail.  However, because the provision mirrors the liquidated damages provision under the Fair Labor Standards Act ("FLSA"), 'courts considering liquidated damages under [the] FMLA have looked at cases under the FLSA.'"[2]  Persky v. Cendant Corp., 547 F. Supp. 2d 152, 156 (D. Conn. 2008) (quoting Palma v. Pharmedica Commc'ns, Inc., 3:00-CV-1128 (HBF), 2003 WL 22750600, at *1 n. 2 (D. Conn. Sept. 30, 2003)); see also Dotson v. Pfizer, Inc., 558 F.3d 284, 302 (4th Cir. 2009) (citing Mayhew v. Wells, 125 F.3d 216, 220 (4th Cir. 1997)); Jordan v. U.S.P.S., 379 F.3d 1196, 1201–02 (10th Cir. 2004); Arban, 345 F.3d at 407–08.  Under the FLSA:

> To establish good faith, a defendant must produce plain and substantial evidence of at least an honest intention to ascertain what the Act requires and to comply with it.   Good faith in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of [the law] and then move to comply with them.   In addition, the reasonableness requirement imposes an objective standard by which to judge the employer's conduct.

Persky, 547 F. Supp. 2d at 157 (internal quotation marks and citations omitted) (alteration in original).  Applying that standard to the FMLA, the employer must show

---

[2] The liquidated damages provision of the FLSA provides:

if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

that it took honest and reasonable steps to: (1) determine what the FMLA required of it, and (2) act in compliance with the requirements.

Due to disputes over the scope of instructions regarding liquidated damages and the reality that the issue would ultimately be decided by the court, even with the jury's advisory determination, the Jury Charge in the instant case did not explain what "good faith" and "reasonable belief" mean in the context of FMLA liquidated damages. See Jury Charge at 26. Accordingly, the court concludes that it will not accord significant weight to the jury's determination pertaining to liquidated damages.

Turning to the merits, the defendant argues that its good faith is evident from documentary and testimonial evidence showing: (1) its consistent efforts to comply with the FMLA, and (2) that it eliminated the Facilities Manager position for purely financial reasons. See Liq. Damages Opp'n at 5–8. Taking these arguments in turn, Radiall's efforts to comply with the FMLA, generally, do not establish that it made similar effort in Mr. Ramadei's case, specifically. Radiall's latter argument impermissibly seeks to relitigate an issue—whether the decision to terminate Mr. Ramadei's employment was motivated, at least in part, by his protected leave—that was within the jury's province and decided in Mr. Ramadei's favor. See Jury Verdict at 1; Arban, 345 F.3d at 408 (holding that the district court abused its discretion in crediting the defendant's argument that it acted in good faith in deciding to terminate the plaintiff's employment before the plaintiff requested medical leave, because, in returning a verdict for the plaintiff, the jury necessarily found that the defendant made its decision based on plaintiff's medical leave). "When legal and equitable issues to be decided in the same case depend on common determinations of fact, such questions of fact are submitted to the jury, and the

court in resolving the equitable issues is then bound by the jury's findings on them." Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 965 (10th Cir. 2002) (citing Ag Servs. of America, Inc. v. Nielsen, 231 F.3d 726, 730 (10th Cir. 2000)).  The Seventh Amendment prohibits the court from reaching a conclusion contrary to the jury's determination on fact issues that are supported by the evidence.  See id.; see also Wade v. Orange Cnty. Sheriff's Off., 844 F.2d 951, 954 (2d Cir. 1988) ("when the jury has decided a factual issue, its determination has the effect of precluding the court from deciding the same fact issue in a different way.").

Radiall further argues that it had reasonable grounds to believe it was not violating the FMLA when it terminated Mr. Ramadei's employment because the documentary and testimonial evidence shows that: (1) Lori Musante ("Ms. Musante"), then-Director of Human Resources, and Patrice Rigoland ("Mr. Rigoland"), General Manager, reasonably believed they had facilitated Mr. Ramadei's protected leave in an appropriate manner and to his satisfaction; and (2) Maite Tristan ("Ms. Tristan"), the President of Radiall, believed her decision was purely financial in nature.  See Liq. Damages Opp'n at 8–11.  Even assuming, arguendo, both sets of beliefs identified by Radiall are objectively reasonable, they do not address the crucial question of whether the defendant took reasonable steps to comply with the FMLA.  Radiall essentially ignored a glaring sign that it should have investigated.  As the documentary and testimonial evidence presented at trial demonstrates, although the position had been identified for potential elimination for some time, the plan to eliminate it was not set in motion until Mr. Ramadei was on leave.  There is no evidence, therefore, that Radiall investigated or attempted to verify that the Facilities Manager position was terminated in

a manner that would comply with the FMLA. <u>See</u> <u>Persky</u>, 547 F. Supp. 2d at 161–62 (holding the defendant failed to act in good faith and could not reasonably believe it was complying with the FMLA because it failed to adequately investigate the circumstances leading to the plaintiff's employment termination).

Further, the defendants made no effort to determine whether Mr. Ramadei could or would be willing to take the Maintenance Associate position. <u>See</u> <u>Persky</u>, 547 F. Supp. 2d at 162 (finding that the defendant did not investigate whether the plaintiff could perform the functions of the "transition" position and noting that defendant dismissed plaintiff's assertions that the position essentially required performing the same duties the plaintiff had been performing on the ground that the position "would have been terminated regardless of whether she was qualified to perform similar services . . . because [the] plaintiff's qualifications [were] irrelevant to the decision the company made" (internal quotation marks and citations omitted)).

The evidence shows that the FMLA was not even considered. At trial, Ms. Musante testified that, although Mr. Ramadei provided Human Resources with sufficient information to place her on notice that his leave qualified as FMLA leave, at no point did she or any other Radiall employee make that determination or provide Mr. Ramadei with notice of his rights, as required by the FMLA. <u>See</u> 12/05/2023 Trial Transcript ("Day 1 Tr.") (Doc. No. 98) at 61:2–62:12; <u>Dollar v. Smithway Motor Xpress, Inc.</u>, 787 F. Supp. 2d 896, 926 (N.D. Iowa 2011), <u>aff'd in part, vacated on other grounds,</u> 710 F.3d 798 (8th Cir. 2013) (holding the defendant lacked good faith and reasonable grounds to believe its actions did not violate the FMLA because the Vice President of Human Resources and Safety "failed to consider the FMLA when he fired [plaintiff]" and "was willfully

indifferent to it").  Relatedly, Ms. Tristan's belief that her decision was solely based on financial matters, presumably based on her ignorance of Mr. Ramadei's protected leave, is of no import here.  See Dotson, 558 F.3d at 303 (rejecting the employer-defendant's argument that, because it did not know the statutory implications of the plaintiff's leave, the award of liquidated damages is punitive).  Radiall had an affirmative "statutory burden of seeking out further information and complying with the FMLA when an employee indicates that he or she is seeking leave for a protected reason."  Id.

In conclusion, given the specific meaning of good faith and reasonable belief in the FMLA context, which were not explained to the jury, the court will not rely on the advisory verdict.  Radiall has not shown by substantial evidence that it made an effort to ensure that the actions it took with respect to Mr. Ramadei's employment complied with the FMLA.  Therefore, Radiall has not proven to the court's satisfaction that it acted in good faith and reasonably believed it was not violating Mr. Ramadei's FMLA rights when it terminated his employment.  Based on the foregoing and in light of the strong presumption of double damages, section 2617 mandates an award of liquidated damages.  See Persky, 547 F. Supp. 2d at 165 ("As the Tenth Circuit has noted, 'the non-discretionary calculation of damages under the FMLA should not be considered a windfall, but rather a congressional judgment, enforced by the courts, designed to compensate employees for the obscure damages that occur when one wrongfully loses wages, even if only temporarily.'" (quoting Jordan, 379 F.3d at 1201)).

Accordingly, the court grants the plaintiff's Motion for Liquidated Damages. Although the plaintiff seeks an award of liquidated damages equal to the back pay award, $187,714, the statute mandates inclusion of the pre-judgment interest,

14

$18,327.72, in the liquidated damages calculation. <u>See</u> 29 U.S.C. § 2617(a)(1)(A)(iii).

As such, the court awards the plaintiff liquidated damages in the amount of

$206,041.71.

       C.      <u>Motion for Award of Front Pay or Reinstatement</u>

       Plaintiff moves for an award of front pay, or in the alternative, reinstatement.  <u>See</u>

Front Pay Mot.  Front pay or reinstatement constitutes equitable relief under the FMLA.

<u>See</u> 29 U.S.C. § 2617(a)(1)(B); <u>Traxler v. Multnomah Cnty.</u>, 596 F.3d 1007, 1011 (9th

Cir. 2010) ("The FMLA does not explicitly grant plaintiffs the right to front pay; any front

pay awards must fall within the section on equitable relief.").  The decision to order

reinstatement or grant a front pay award is discretionary.  If the court finds that the

award of back pay is sufficient to make the plaintiff whole, it may deny a request for

equitable relief.  <u>Palma</u>, 2003 WL 22750600, at *3.

       "In deciding whether an award of front pay is appropriate, a court should consider

(1) whether 'reinstatement [is] either impossible or impracticable' (2) whether the plaintiff

has a reasonable prospect of obtaining comparable employment; and (3) whether the

calculation of front pay would involve 'undue speculation.'"  <u>Shannon v. Fireman's Fund

Ins. Co.</u>, 136 F. Supp. 2d 225, 233 (S.D.N.Y. 2001) (quoting <u>Whittlesey v. Union

Carbide Corp.</u>, 742 F.2d 724, 729 (2d Cir. 1984)); <u>see also</u> <u>Padilla v. Metro–North

Commuter R.R.</u>, 92 F.3d 117, 125–26 (2d Cir.1996).

       "As a practical matter, front pay is awarded at the court's discretion only if the

court determines that reinstatement is inappropriate, such as where no position is

available or the employer-employee relationship has been so damaged by animosity

that reinstatement is impracticable."  <u>Traxler</u>, 596 F.3d at 1012 (citing <u>Whittlesey</u>, 742

F.2d at 728).

       1.      Reinstatement

Neither Mr. Ramadei nor Radiall meaningfully address reinstatement in their papers.  Mr. Ramadei only notes that an award of front pay is more appropriate than reinstatement due to hostility between himself and Radiall.  <u>See</u> Front Pay Mot. at 2.  In response, Radiall asserts that, because neither party seeks reinstatement, it would not address that form of relief in its Memorandum in Opposition.  <u>See</u> Front Pay Opp'n at 1.

Upon further questioning at oral argument, the parties confirmed that there is some hostility between them as a result of the litigation, making reinstatement impossible.

       2.      Reasonable Prospect of Obtaining Comparable Employment

Mr. Ramadei argues the court should award front pay because, despite his efforts, he has been unable to secure comparable employment.  <u>See</u> Front Pay Mot. at 2–3.  In its Memorandum in Opposition, the defendant first argues that it "should not be made to subsidize" the plaintiff in the form of a front pay award because (1) the plaintiff failed to adequately mitigate his damages; and (2) preferred to work for himself and at his own pace as evidenced by his business, Ramadei Corvette, LLC, an initiative, which Radiall argues constitutes a "change in career goals."[3]  <u>See</u> Front Pay Opp'n at 3–4.

In advancing an argument concerning the adequacy of Mr. Ramadei's mitigation efforts, Radiall seeks to relitigate an issue within the jury's province and decided in Mr.

---

[3] The court will not address the defendant's argument that the court need not award front pay because there was no evidence of intentional conduct on the part of the defendant.  <u>See</u> Front Pay Opp. at 6-7.  While the nature of the defendant's conduct may affect the possibility of reinstatement, it has little to no bearing on the issues regarding front pay, <u>i.e.</u>, whether there exists a reasonable prospect that the plaintiff can secure comparable employment and whether the calculation of front pay would be unduly speculative.  See <u>Shannon v. Fireman's Fund Ins. Co.</u>, 136 F. Supp. 2d 225, 233 (S.D.N.Y. 2001) (citing <u>Whittlesey</u>, 72 F.2d at 729).

Ramadei's favor.[4]  In response to the question on the Verdict Form asking whether Radiall had proven by a preponderance of evidence that suitable alternative work existed, and that Mr. Ramadei did not make reasonable efforts to obtain such work, the jury answered, "no."  <u>See</u> Jury Verdict at 2.  It was Radiall's burden to prove that Mr. Ramadei failed to satisfy his duty to mitigate, <u>see</u> <u>Dailey v. Societe Generale</u>, 108 F.3d 451, 456 (2d Cir. 1997) (citing <u>Clarke v. Frank</u>, 960 F.2d 1146, 1152 (2d Cir. 1992)), and Radiall failed to meet its burden at trial.  The court will not reexamine the issue now.

        3.    Speculative

     Radiall argues that an award of front pay based on the salary of either the Facilities Manager or Maintenance Associate positions would be speculative because there was evidence at trial that Radiall planned to eliminate the Facilities Manager position, and it is unclear whether Mr. Ramadei would have accepted the Facilities Associate position.  <u>See</u> Front Pay Opp'n at 4–5.

     The jury, however, must have implicitly concluded that Mr. Ramadei would have chosen to remain at Radiall had he not been terminated.  The jury was instructed that, "[a]n employer who has violated the FMLA must pay damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to the employee.  However, you should not consider any lost earnings based on future pay."  Jury Charge at 24.  In light of this instruction, the jury could only have awarded damages if it concluded Mr. Ramadei would have been employed by Radiall had he not been terminated.  Consequently, if the court were to adopt Radiall's position, it risks contradicting the jury's implicit finding and interfering with Mr. Ramadei's Seventh

---

[4] The affirmative defense of failure to mitigate damages is an issue within the jury's province.

Amendment right.  See Walker v. Schult, 45 F.4th 598, 618 (2d Cir. 2022) ("'The court is not permitted to find as a fact a proposition that is contrary to a finding made by the jury,' or 'findings that were implicit in the jury's verdict.'" (quoting Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007)); see also Wade, 844 F.2d at 954.

In light of Mr. Ramadei's 64 years of age, and the lack of reasonable prospects of securing comparable employment, the court concludes that the back pay award does not make the plaintiff whole and exercises its discretion to grant his request for an award of front pay.

### 4.   Amount

The court now turns to the issue of the amount of front pay to award.  Mr. Ramadei seeks $212,687, based on projected salary, benefits, and annual raises of two percent each year for 2024 and 2025, less earnings from his business, Ramadei Corvette.  See Front Pay Mot. at 3–4.  He argues that this amount is reasonable because it will bring him to age 66, just shy of his goal of retiring at age 67.  See id. at 3. First, Radiall contends that, if any front pay is to be awarded, it should be based on the Maintenance Associate salary.  See Front Pay Opp'n at 8-10.  Second, Radiall argues that front pay should be limited to one year because it is speculative to award front pay past the age of 65.  See id. at 10.

As to its first point, Radiall avers that the "only credible explanation" for the jury's award of $187,714—exactly one-half of the $375,427 requested by Mr. Ramadei—is that the jury clearly recognized that Radiall was going to replace the Facilities Manager position with the Maintenance Associate position and relied on Ms. Tristan's testimony that the Maintenance Associate position would cost Radiall half of the cost of the Facilities Manager position.  See Front Pay Opp'n at 7–8.  Mr. Ramadei argues that

Radiall's proffered explanation for the jury's award is speculative.  <u>See</u> Front Pay Reply at 2–3.  Explaining that while he proved "he was terminated only after Radiall intentionally retaliated against him for taking FMLA leave[,] Radiall did <u>not</u> prove that the Facilities Manager position would have been eliminated regardless of whether [he] took medical leave."  <u>See</u> Front Pay Reply at 3.

The court agrees with the plaintiff and declines to speculate on the basis of the jury's award.  As Mr. Ramadei emphasizes, Ms. Tristan's testimony, that the cost of the facilities position would be cut in half, does not provide much information.  <u>See</u> Front Pay Reply at 2–3 & 3 n.1.  On cross examination, Ms. Tristan estimated that the replacement saved Radiall "in the neighborhood of $50,000."  <u>See</u> 12/07/2023 Trial Transcript ("Day 3 Tr.") (Doc. No. 100) at 639:15–19.  However, her testimony is of low probative value because of her inability to recall information related to the 2021 budget, <u>see id.</u> at 639–641, and Radiall's failure to provide documents that corroborate the testimony on which the defendant now relies.  As a result, it would require the court to speculate if it were to calculate front pay based on the Maintenance Associate position because there is no evidence demonstrating whether the position was salaried or paid hourly; how many hours the Associate worked; whether bonuses were paid; or whether Radiall offered any benefits.

Further, Richard Broga ("Mr. Broga"), Mr. Ramadei's former supervisor, testified at trial that Radiall hired contractors to resolve matters that the Maintenance Associate could not perform.  <u>See, e.g.</u>, Day 3 Tr. at 486:18–487:23, 492:9–498:23.  Although the landlord of the Wallingford facility appeared to cover the costs for outside work, <u>see id.</u> at 484:15–485:2, Radiall hired and paid contractors for at least some facilities-related

matters that Mr. Ramadei handled prior to his termination but that Munson could not complete.  See id. at 487:9–23, 501:4–503:24.[5]  Ms. Tristan's testimony that Radiall's savings were in the range of $50,000 does not make clear whether that number accounts for the costs related to hiring contractors.  As such, the court concludes that neither a 50% nor $50,000 reduction is supported.

Radiall also contends that front pay should be limited to one year because it is speculative to award front pay past the age of 65.  See id. at 10.  The cases cited by Radiall as support are readily distinguishable.  In Shannon, the court noted that although the plaintiff—63 years old at the time of trial—testified that he intended to work at his former place of employment until the age of 70, there was evidence that contradicted the plaintiff's testimony.  See Shannon v. Fireman's Fund Ins. Co., 136 F. Supp. 2d 225, 234 (S.D.N.Y. 2001) ("Immediately upon his termination, however, Shannon told Edward Helfers, Shannon's manager, . . . that he wanted to work until he was at least sixty-five years old.  At the time of the termination, Shannon also indicated to his sister that all he wanted was to work three more years so he could retire comfortably." (internal citations omitted)).  The court in Shannon further noted that the plaintiff became eligible for his pension at age 65.  See id.  In Buckley, the plaintiff asserted he had planned to remain at his former place of employment until he reached the retirement age of sixty-five.  Buckley v. Reynolds Metal Co., 690 F. Supp. 211, 216 (S.D.N.Y. 1988).  None of those factual considerations are present in the instant case.

---

[5] At oral argument, defense counsel contested the court's recounting of this testimony.  However, it appears from the transcript in question, that defense counsel's recollection of this testimony is inaccurate.  See Day 3 Tr. at 502:5–503:24.

Front pay awards until or past the age of 65 can certainly be speculative when the plaintiff is relatively young, and the award encompasses ten or more years given the reality that many events can occur in that timespan that could terminate or change the employment relationship.  See, e.g., Whittlesey, 742 F.2d at 729; Buckley, 690 F. Supp. at 216; Chisholm v. Mem'l Sloan-Kettering Cancer Ctr., 824 F. Supp. 2d 573, 577 (S.D.N.Y. 2011); accord Dotson, 558 F.3d at 300.  The circumstances in the present case do not render a front pay award past the age of 65 unduly speculative.  See Whittlesey, 742 F.2d at 729 (affirming a district court's decision to award front pay because "[t]he time period was relatively short, approximately four years, and thus did not involve some of the uncertainties which might surround a front pay award to a younger worker.").  Even though Mr. Ramadei was terminated on November 13, 2020, at age 61 or 62, he applied to facilities-related jobs at least through February 18, 2022.[6] Mr. Ramadei testified that he would have liked to have worked until at least age 67, because he is not "the type of person to sit around."  See Day 1 Tr. at 162:15—19.  The fact that he began Ramadei Corvette LLC buttresses his testimony that he prefers to remain active.  The front pay amount sought by the plaintiff is reasonably limited to a period of two years.[7]

In light of the foregoing, the front pay calculation will be based on Mr. Ramadei's salary for 2019, his last full year of employment, in the amount of $112,177.17.[8]  See

---

[6] Mr. Ramadei credibly testified that he was still applying to jobs at the time of trial.  See Day 1 Tr. at 140:6–11.

[7] The plaintiff's request for two years of front pay, at which time he will be 66 years of age, constitutes a compromise between the defendant's position and the plaintiff's stated intention to work until at least 67.

[8] In its Memorandum in Opposition and at oral argument, Radiall cited to Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1182 (2d Cir. 1996), to argue that using the salary associated with the Facilities

Pl.'s Ex. 13, 2019 W-2.  The court declines the plaintiff's request to engage in a

hypothetical calculation of salaries for 2024 and 2025 based on an annual two percent

raise.  <u>See</u> Front Pay Mot. at 3–4.  Evidence at trial pertaining to Mr. Ramadei's raises

shows a general trend of a decreasing annual raise rate.[9]  <u>See</u> Def.'s Trial Ex. 60,

2017–2019 Bonus History.  Mr. Ramadei's salary, including bonus pay, increased by

four percent from 2017 to 2018, but increased less than one-tenth of a percent from

2019 to 2020.  <u>See</u> <u>id.</u>  Mr. Ramadei did not receive a raise in the spring of 2020—the

season during which a raise, if any, would have gone into effect.  <u>See</u> 12/06/2023 Trial

Transcript (Doc. No. 99) at 280:9–281:6.  Therefore, the court will exclude annual raises

from its calculation of front pay.

The court begins its front pay calculation with an award in the amount of

$224,354.34, which is the sum of the projected annual salary of $112,177.17, for each

of 2024 and 2025.  Mr. Ramadei estimates he will earn $47,687 from his Corvette

business in 2024 and 2025, collectively.  Front Pay Mot. at 4.  This estimate, which

Radiall does not challenge, <u>see</u> Front Pay Opp'n at 10–12 (challenging the plaintiff's

calculations on other grounds), is reasonable given Mr. Ramadei's testimony that he

earned the same amount from his Corvette business in 2022 and 2023, combined.  <u>See</u>

Day 2 Tr. at 266:10–14.  The award is, therefore, reduced by $47,687, which equals

---

Maintenance Position would create an undue windfall because it would be placing him in a better position
than he otherwise would have been had he not been terminated.  However, the facts in <u>Reed</u> are very
different from those in the instant case.  The court in <u>Reed</u> limited the plaintiff's front pay to seven weeks
because the employer's office was scheduled to shut down seven weeks after the jury rendered its
verdict.  <u>See</u> <u>id.</u>

[9] In his Motion, Mr. Ramadei relied on his own testimony that he was awarded an annual raise of
approximately two percent each year.  <u>See</u> Front Pay Mot. at 3 (citing Pl.'s Ex. 1, Day 1 Tr., at 263).
Even assuming, <u>arguendo</u>, Mr. Ramadei received an average annual raise of two percent, the evidence
shows a decreasing trend in the last few years for which there is data pertaining to his base pay and
bonus.

$176,667.34.  The award is then increased by $5,096—the amount Mr. Ramadei expended on healthcare costs in 2023—for each year, or $10,192 for two years, for health benefits.[10]  The total amount of front pay the court awards is $186,859.34.

The plaintiff's Motion for Front Pay or Reinstatement is granted in part.  Front pay in the amount of $186,859.34 is awarded, and reinstatement is denied.

D.    Motion for Award of Attorney Fees and Costs

The plaintiff moves for an award of reasonable attorney fees and costs.  See Fees & Costs Mot.  The FMLA provides that, "in addition to any judgment awarded to the plaintiff," the court shall "allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant."  29 U.S.C. § 2617(a)(3).  "Both [the] [Second Circuit] and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'"  Millea v. Metro-North R. Co., 658 F.3d 154, 166 (2d Cir. 2011) (quoting Arbor Hill Concerned Citizens Neighborhood Assoc. v. Cnty. of Albany, 522 F.3d 182, 183 (2d Cir. 2008)); see also Perdue v. Kenny A. ex. Rel. Winn, 559 U.S. 542, 552 (2010)).  Neither party contests the use of the lodestar method in the court's calculation of a presumptively reasonable attorney's fees calculation.  The lodestar requires multiplying "a reasonable hourly rate" by "the reasonable number of hours required by the case."  Millea, 658 F.3d at 166.

---

[10] The defendant did not raise any particular objections to this amount in its Memorandum in Opposition.  Further, it bears noting that Ramadei sought front pay related to benefits in the amount of $5,096, which represents the lowest yearly sum he has had to pay so far.  See Day 2 Tr. at 265:16–22. From his termination until the date of trial, he had expended $21,649 total in healthcare costs, see id., i.e., an average of $7,216.33 per year.

1.      Reasonable Hourly Rate

When determining a reasonable hourly rate, the court should consider "case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate." See Arbor Hill, 522 F.3d at 189.  Such factors include, inter alia:

> the time and labor spent by counsel, the novelty and complexity of the legal issues, the skill required to perform the legal service properly, the preclusion of other employment due to acceptance of the case, the fees customarily charged in the same locality for similar services, whether the fee is fixed or contingent, the lawyer's experience and ability, relevant time limitations imposed by the client or circumstances of the case, the magnitude of the case and the results obtained, and the nature and length of the lawyer-client relationship.

Johnson v. Ga. Highway Exp., Inc., 488 F.2d 714, 717–720 (5th Cir. 1974) (listing factors for determining the reasonableness of attorney's fees).

Several attorneys worked on Mr. Ramadei's case, to varying degrees.[11]  See Fees & Costs Mot. at 5.  Attorneys Amanda M. DeMatteis ("Attorney DeMatteis") and Betsy A. Ingraham ("Attorney Ingraham") billed at $500 per hour.  See id.  Attorney Joshua R. Goodbaum ("Attorney Goodbaum") billed at $550 per hour.  See id.  Attorney Meaghan Kirby ("Attorney Kirby") billed at $250 per hour.  See id.  Counsel for Mr. Ramadei argue that their experience and recognition in the legal community, the risk of representation (contingency fee), and the market support their requested rates.  See id. at 5–11.

---

[11] In addition to the attorneys identified in the body of this Ruling, counsel notes that Attorney Jordan Wheeler spent 12 minutes working on this case and that she billed at an hourly rate of $350.  See Fees & Costs Mot. at 5, 8 n.3; Pl.'s Ex. 4, Time Entry Summary at 4.  Because little information was provided regarding Attorney Wheeler's experience, see Fees & Costs Mot. at 8 n.3, the court cannot determine whether her hourly rate is reasonable.  On this ground, and considering the miniscule amount of time billed, the court declines to award Attorney Wheeler fees.

a.    <u>Experience & Recognition</u>

Since graduating from law school in 2012, lead counsel, Attorney DeMatteis, has practiced in the area of employment law.  <u>See</u> <u>id.</u> at 5.  Attorney DeMatteis has practiced at Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C ("Garrison") since 2016, and in 2020, she became partner.  <u>See</u> <u>id.</u> 5–6.  She has tried six cases to verdict.  <u>See</u> <u>id.</u> at 6.  Attorney Goodbaum graduated law school in 2009 and has practiced employment law at Garrison since 2011.  <u>See</u> <u>id.</u> at 6–7.  Similarly to Attorney DeMatteis, Attorney Goodbaum has tried six cases to judgment.  <u>See</u> <u>id.</u> at 7.

Attorney Ingraham has primarily practiced general litigation in Connecticut since 2004, and has tried more than twenty cases to verdict.  <u>See</u> <u>id.</u> at 8.  She joined Garrison, practicing exclusively employment law, in early 2022.  <u>See</u> <u>id.</u>  Attorney Kirby clerked for a year on the Connecticut Appellate Court and practiced general civil litigation for nearly two years prior to joining Garrison in October 2023 as an associate practicing employment law.  <u>See</u> <u>id.</u> at 8–9.

Counsel argues that the requested rates correspond to the market rate for attorneys with their experience.  In support of their argument regarding market rates, counsel cites to <u>Champagne v. Columbia Dental, P.C.</u>, in which Judge Bryant noted that it is "reasonable to infer that hourly rates have increased" since the $325–$450 customary hourly rate for highly experienced litigators in 2008.  <u>See</u> No. 3:18-CV-01390 (VLB), 2022 WL 951687, at *5 (D. Conn. Mar. 30, 2022).  While Judge Bryant did also note that "an hourly rate of $450 in 2008 is the equivalent buying power to $604.85 in February 2022", <u>see</u> <u>id.</u>, she seemingly only did so to make clear that counsel's requested hourly rate of $450 was more than reasonable given his status as a managing partner with approximately 18 years of experience.  <u>See</u> <u>id.</u>, at *5–6.

25

From its own review of cases in the past three years, the court finds the prevailing rate to be approximately $350–$450 for litigators with extensive experience and approximately $300 for mid-level associates.  See, e.g., Cornelio v. Connecticut, No. 3:19-CV-0129 (JAM) (TOF), 2023 WL 10802701, at *7 (D. Conn. Nov. 28, 2023) (finding $350–$450 hourly rates for litigators, including partners, with extensive experience to be customary); Rzasa v. BJ's Rests., Inc., No. 3:23-CV-0140 (JCH), 2023 WL 3860457, at *4 (D. Conn. June 7, 2023) (finding hourly rates of $500 for a partner, $400 for a senior associate, and $300 for a mid-level associate to be reasonable); Rhomes v. Mecca Auto, LLC, No. 3:21-CV-01360 (KAD), 2022 WL 3082986, at *6 (D. Conn. Aug. 3, 2022) (concluding that hourly rates of $475 for a managing attorney and $350 for a senior associate are reasonable).  The rare cases in which the court has approved an hourly rate of $500 were due, in large part, to the litigator's decades of experience.  See Cornelio, 2023 WL 10802701, at *9.

As such, the court finds that, based on its own knowledge of attorney hourly rates in Connecticut, the record before it, and a review of the relevant case law, the requested hourly rate of $250 for Attorney Kirby and an hourly rate of $450 for Attorney DeMatteis, $475 for Attorney Goodbaum, and $475 for Attorney Ingraham are reasonable.

b.   Contingency Fee

Next, the court notes that counsel took on representation on a contingency basis. "[C]ontingent fee arrangements ordinarily entitle the victorious attorney 'to some premium for the risk incurred.'"  Cornelio, 2023 WL 10802701, at *8 (quoting Sakiko Fujiwara v. Sushi Yasuda Ltd., 58 F. Supp. 3d 424, 438–39 (S.D.N.Y. 2014)).

Quite notably, Attorney DeMatteis has represented Mr. Ramadei since October 2020, when he received notification of his termination.  The court easily finds that she

26

has borne the risks of assuming representation.  See Fees & Costs Mot. at 9; Pl.'s Ex. 4, Time Entry Summary (Doc. No. 105-4) at 1; cf. Cornelio, 2023 WL 10802701, at *8 (noting that counsel did not bear as much risk as he would have had he been involved since the beginning because, after remand, there were no experts or depositions and only a modest amount of written discovery occurred).  As such, the court concludes Attorney DeMatteis is entitled to a premium of $25, resulting in an hourly rate of $475.

In sum, based on the aforementioned factors, the supporting documentation, and this court's familiarity with hourly rates in Connecticut, the court will award hourly rates of $475, $475, $475, and $250 for Attorneys DeMatteis, Goodbaum, Ingraham, and Kirby, respectively.

### 2. Reasonable Number of Hours Required

Having determined the reasonable hourly rate for each attorney involved, the court turns to the issue of whether the hours worked constitute "a reasonable number of hours required by the case."  Millea, 658 F.3d at 166.

Counsel for Mr. Ramadei seeks a fee that accounts for the total number of hours worked on the case from the time Attorney DeMatteis undertook representation in October 2020, until the filing of the post-trial Motions at issue in the instant Ruling.  See Fees & Costs Mem. at 11–12.  Radiall contests the inclusion of hours worked in connection with the age discrimination claims, which were dismissed at the summary judgment stage.  See Fees & Costs Opp'n at 4–6.

Generally, "work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved."  Hensley v. Eckerhart, 461 U.S. 424, 435 (1983) (internal quotation marks and citation omitted).  Therefore, a court should exclude hours that are "excessive or duplicative" and that "reflect work done only

27

in connection with unrelated claims on which plaintiffs did not succeed". LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998). However, where a plaintiff's claims involve "a common core of facts" or are "based on related legal theories," "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." See Hensley, 461 U.S. at 435. Because "[s]uch a lawsuit cannot be viewed as a series of discrete claims," the court should not reduce the fee award because the plaintiff did not succeed on every claim. See id. Thus, a plaintiff may be entitled to attorney's fees incurred from hours worked on claims that are ultimately unsuccessful, provided that the unsuccessful claims "were 'inextricably intertwined' with the successful claim and involved the same facts and related legal theories." See Johnson v. Rapice, No. 3:00-CV-1556 (DFM), 2007 WL 1020747, at *2 (D. Conn. Mar. 30, 2007) (quoting Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999)).

Radiall argues that the court should reduce the portion of the award attributable to work and expenses incurred through the summary judgment stage on the ground that the age discrimination and FMLA violation claims did not share a common core of facts, differed in legal theory, and required different proofs. See Fees & Costs Opp'n at 4–6. In response, Mr. Ramadei counters that the case would have been litigated the same notwithstanding the age discrimination claims. See Fees & Costs Reply at 1–2. In particular, Mr. Ramadei contends that all "person[s] deposed during litigation testified at trial[;] [n]early all documents used in depositions with those witnesses became trial exhibits[;] [t]here was no motion practice relating to discovery issues[;] [and] [t]here were no experts related to the age claims." See id.

Both the age discrimination and FMLA violation claims were subject to the

McDonnell-Douglas burden-shifting framework.  See MSJ Ruling at 9–10, 17–18.

Although the elements of the age discrimination claims and FMLA violation claim differ

in the abstract, there was overlap because they involved the same termination decision.

For instance, Mr. Ramadei presumably relied on and could have marshalled the same

evidence to show that he was qualified for his position and that he experienced an

adverse employment action for both causes of action, if those elements had been

disputed by Radiall.[12]  See id. at 10–11, 18.  That the causes of action shared roughly

the same core facts is readily discernible from the fact that Radiall offered the same

explanation for its decision to terminate Mr. Ramadei's employment to meet its burden

at the summary judgment stage to articulate a legitimate, nondiscriminatory reason for

its adverse action.  See id. at 21.  Consequently, the court declines to reduce the pre-

summary judgment fees and costs in half as suggested by the defendant.

However, although there was significant overlap and very little discovery that was

not shared across all claims, there was at least some time that was spent performing

work that pertained only to the age discrimination claims.  Mr. Ramadei's counsel

admitted as much at oral argument.  She conceded that, in opposing the Motion for

Summary Judgment, some time was spent making the argument that the evidentiary

record supported an inference of age discrimination, which shared little to no overlap

with the arguments pertaining to the FMLA claims.  See, e.g., MSJ Ruling at 15–17.  As

---

[12] With respect to his state-law age discrimination claim, Radiall did not dispute in its Motion for Summary Judgment the first three elements of Ramadei's prima facie showing that (1) he was within the protected age group; (2) he was qualified for his position; and (3) he suffered an adverse employment action.  See MSJ Ruling at 10.  The only issue in dispute was the fourth element—whether the adverse action occurred under circumstances giving rise to an inference of discrimination.  See id.

such, the court will exercise its discretion and reduce pre-summary judgment fees by ten percent to account for work done solely in connection with the age discrimination claims.  See Marion S. Mishkin Law Office v. Lopalo, 767 F.3d 144, 150 (2d Cir. 2014).

The attorneys who worked on Mr. Ramadei's case spent 109.8 out of 420.7 total hours representing Mr. Ramadei through the summary judgment stage.[13]  See Pl.'s Ex. 3, Time Entries (Doc. No. 105-3) at 1–9; Pl's Ex. 4, Time Entry Summary (Doc. No. 105-4).  The fees associated with these 109.8 hours amount to $52,155.  A ten percent reduction results in a fee award of $46,939.50, for work performed through summary judgment.  Because the defendant does not oppose the remaining portion of the requested award, and the court's review revealed no duplicate or unnecessary billing, the court concludes that the post-summary judgment time of 310.9 hours is reasonable, resulting in a post-summary judgment award of $116,290.00.  The total amount in attorneys' fees awarded to the plaintiff is $163,229.50.

3.      Reasonableness of Costs

The plaintiff also moves for an award of costs in the amount of $8,151.72, in connection with filing fees, service of process, deposition fees, and parking fees.  See Fees & Costs Mot. at 13; Pl.'s Ex. 5, All Expenses (Doc. No. 105-5).  Radiall does not appear to oppose any costs on any other ground beyond those associated with pre-summary judgment age discrimination claims.  See, supra, Section III.D.2.  Mr. Ramadei's pre-judgment costs equal $3,179.32.  See Fees & Costs Mot. at 13; Pl.'s Ex. 5, All Expenses (Doc. No. 105-5).  For the reasons set forth above, see, supra, Section III.D.2, the court will reduce this amount by ten percent, resulting in an award of

---

[13] These numbers exclude Attorney Wheeler's 0.2 hours.

$2,861.39 for pre-judgment costs.  Because the remaining costs sought by Mr. Ramadei are reasonable, the court awards the claimed post-summary judgment costs in full, in the amount of $4,972.40.  Therefore, the total amount in costs awarded to the plaintiff is $7,833.79.

### 4.    Reduction Based on "Limited Success"

Radiall contends that the jury's damages award of $187,714, amounting to half of what the plaintiff sought, counsels in favor of reducing fees and costs by twenty to eighty percent.  See Fees & Costs Opp'n at 6–9.  Radiall arrives at a reduction in the 20–80% range on the ground that: (1) so far, Mr. Ramadei has already been unsuccessful in achieving 50% of the back pay he sought, i.e., 20% of the total amount of approximately $1 million in remedies sought; and (2) if liquidated damages and front pay are denied, Mr. Ramadei will have only recovered 20% of the total amount he sought.  See id. at 8–9.

"A presumptively correct 'lodestar' figure" generally "should not be reduced simply because a plaintiff recovered a low damage award."  Cowan v. Prudential Ins. Co. of Am., 935 F.2d 522, 526 (2d Cir. 1991).  The court remains mindful of the principle that it should generally avoid imposing significant reductions in fees in civil rights cases based on relatively low damages awards.  Id.  Particularly relevant here is that:

> By enacting a fee-shifting provision for FMLA claims, Congress has already made the policy determination that FMLA claims serve an important public purpose disproportionate to their cash value.  We cannot second-guess this legislative policy decision.

See Millea, 658 F.3d at 167.  Further, fee awards in FMLA cases cannot be reduced solely based on the size of the damages award.  See id. at 168.

> FMLA claims are often small-ticket items, and small damages awards should be expected without raising the inference that the victory was

technical or de minimis.  If an expense of time is required to obtain an award that is not available by voluntary compliance or offer of settlement, the expense advances the purposes of the statute.  Absent a purely technical victory in an otherwise frivolous suit, litigation outcomes are only relevant to fee award calculations when they are a direct result of the quality of the attorney's performance.

Id.

Although he sought a higher amount, Mr. Ramadei obtained a damages award that is far from nominal or miniscule.  It bears emphasis that, with the court's dispositions in the instant Ruling, plaintiff will be awarded a total of approximately $580,000, excluding attorneys' fees and costs.  There is no indication that the jury's decision to award less than the amount Mr. Ramadei sought was a reflection on the performance by his counsel.

Accordingly, the court thus declines to reduce the attorneys' fees award based on the amount of back pay damages awarded.

        5.      Summary

Based on the foregoing, the court grants in part the Motion for Attorneys' Fees and Costs and awards the plaintiff $163,229.50 in attorneys' fees and $7,833.79 in expenses and costs.

## IV.   CONCLUSION

For the reasons stated above, the Motion for an Award of Pre- and Post-Judgment Interest (Doc. No. 103); Motion for Liquidated Damages (Doc. No. 102); Motion for Front Pay or Reinstatement (Doc. No. 104); and Motion for Attorney Fees and Costs (Doc. No. 105) are granted in part.

The plaintiff is awarded pre-judgment interest in the amount of $18,327.72, and post-judgment interest, at a rate to be calculated under section 1961 of title 28 of the

U.S. Code and accruing on the day judgment is entered in this case.  The court awards plaintiff liquidated damages in the amount of $206,041.71, and front pay in the amount of $186,859.34.  The court also awards attorneys' fees in the amount of $163,229.50, and costs in the amount of $7,833.79.

**SO ORDERED.**

  Dated at New Haven, Connecticut this 16th day of September 2024.


         /s/ Janet C. Hall
        Janet C. Hall
        United States District Judge